UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 20-CV-23856-COOKE

CAROL KELLY,

    Plaintiff,

v.

CARNIVAL CORPORATION,

    Defendant.
_____/

### ORDER ON DEFENDANT'S *DAUBERT* MOTION IN LIMINE TO STRIKE REPORT AND OPINIONS OF RANDALL JAQUES

THIS CAUSE came before the court on Defendant, Carnival Corporation's ("Defendant" or "Carnival"), *Daubert* Motion in Limine to Strike Report and Opinions of Randall Jaques [ECF No. 22] (the "Motion"). This matter was referred to the undersigned pursuant to an Order of Referral for all non-dispositive pretrial matters by the Honorable Marcia G. Cooke [ECF No. 6].

THIS COURT has reviewed the Motion, the Response [ECF No. 31], and the Reply thereto [ECF No. 36], as well as the documents submitted in support of the parties' filings, including the Expert Report [ECF No. 22-2] and curriculum vitae [ECF No. 31-1] of Randall Jaques, the pertinent portions of the record, and all relevant authorities.

    **I.    PROCEDURAL BACKGROUND**

This is a maritime negligence action in which Plaintiff, Carol Kelly ("Plaintiff" or "Ms. Kelly"), seeks damages for injuries allegedly sustained while a passenger aboard Carnival's cruise ship, the Carnival Glory [ECF No. 1 at ¶¶ 7-9]. Ms. Kelly alleges she severely injured herself by stepping on a rogue screw on her stateroom floor. *Id*. at ¶¶ 9-10.

In the Complaint, filed September 9, 2020 [ECF No. 1], Plaintiff asserts three causes of action, all sounding in negligence, against Defendant: (1) negligent failure to warn; (2) negligent failure to maintain; and (3) general negligence. *Id*. Generally, Plaintiff alleges Defendant was negligent in failing to maintain Plaintiff's stateroom in a safe manner by preventing the screw at issue from falling and remaining on the carpet of the stateroom, failing to discover the screw was there through proper inspection and maintenance, and, to the extent Defendant knew of the risk of such a danger, failing to warn Plaintiff of the risk. Defendant filed an Answer and Affirmative Defenses on October 12, 2021 [ECF No. 5].

On November 19, 2021, Defendant filed a Motion for Summary Judgment [ECF No. 18]. Shortly thereafter, on December 3, 2021, Defendant filed the Motion now before the Court [ECF No. 22] seeking to strike the report and opinions of Plaintiff's cruise ship safety expert, Randall Jaques, pursuant to Federal Rule of Evidence 702 and *Daubert v Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). In support of her Response to Defendant's Motion for Summary Judgment, filed December 15, 2021 [ECF No. 25], Plaintiff submitted Mr. Jaques's Expert Report [ECF No. 25-11]. Defendant's Motion for Summary Judgment is now ripe, and this case is set for trial during the trial period beginning April 25, 2022. *See* ECF No. 7.

## II.   THE EXPERT AND REPORT AT ISSUE

According to Mr. Jaques's Report, Plaintiff retained Mr. Jaques as a Cruise Ship Safety Expert "to perform a cruise ship accident analysis and assess events leading up to [Plaintiff's] injuries." [ECF No. 22-2 at 1]. Mr. Jaques's Report further explains that Plaintiff asked him

> to assess the causes of the incident and to assess and evaluate the safety of the subject area of the vessel, the vessel's relevant equipment and facilities, the relevant industry standards including applicable safety standards, the policies and procedures of Carnival Cruise Lines, including the SMS ships management system as required by the SOLAS Safety of Life At Sea and the IMO International Maritime Organization, the vessel's crew, and ultimately determine what were the

causes which contributed to a metal screw becoming lodged in [Plaintiff's] right foot...

ECF No. 22-2 at 1-2.

Mr. Jaques indicates he has 16 years' work experience in security and safety positions for various cruise lines, including Defendant. [ECF No. 13-1 at 3]. His responsibilities working for the cruise lines included, *inter alia*, investigating accidents and incidents occurring on cruise ships and identifying the causes of such accidents. [ECF No. 22-2 at 2]. Mr. Jaques estimates he has investigated over 2,000 accidents and injuries on both land and sea, ranging from slip and falls and water slide injuries to fire burns and food allergies. *Id*. at 4.

To prepare for his analysis of Plaintiff's incident, Mr. Jaques reviewed the "applicable codes, standards, and laws available at the time of the subject incident," Carnival's business records, and Carnival's responses to Ms. Kelly's discovery requests. *Id*. at 6. He also inspected the infamous screw at issue, viewed photographs of the subject stateroom, watched a YouTube video of an allegedly similar stateroom to that in which Plaintiff was injured, and interviewed Plaintiff and her son, Robert Kelly. *Id*.

Notably, Mr. Jaques did not inspect the stateroom where the alleged incident occurred because he determined that, given the passage of time between the date of the incident and his retention, such an inspection would not be beneficial to his analysis. *Id*. at 7. And Mr. Jaques did not conduct any tests or analyses involving the screw and the furnishings and equipment on Defendant's ship, nor did he provide further insight into the methodology of his accident reconstruction and analysis. Mr. Jaques also did not cite to or provide specific cruise industry standards in his report, despite having purportedly reviewed them prior to his analysis and making general reference to some unspecified and uncited industry manuals and standards. Indeed, Mr. Jaques provided nothing to support or demonstrate the bases for his

opinions other than his own personal experience and the statements of the Plaintiff and her son.

Mr. Jaques provides three opinions, all of which Defendant seeks to strike: (1) the screw came from Ms. Kelly's stateroom and Carnival is at fault for not ensuring the room's fixtures were in good condition, (2) failure to maintain the mechanical components in Ms. Kelly's stateroom was a careless and negligent act by Carnival's staff, and (3) Carnival was negligent for allowing the inspection of cabin compliance to break down. *Id.* at 10-15.

### III. APPLICABLE LEGAL STANDARDS

#### A. *Analyzing The Admissibility Of Expert Testimony*

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Pursuant to Rule 702, an expert witness may testify in the form of an opinion if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Court serves as a gatekeeper to the admission of scientific and technical expert evidence. *Quiet Technology DC-8 v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340 (11th Cir. 2003) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594–95 (1993)). The Court's role is especially significant given that an expert's opinion can be both powerful and quite misleading. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Thus, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *See Rink v. Cheminova*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

In determining the admissibility of expert testimony, the Court engages in a three-part inquiry to consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology used by the expert in reaching his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact to understand the evidence or to determine a fact in issue through the application of scientific, technical or specialized expertise.

*City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert*, 509 U.S. at 589). The Court of Appeals for the Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among these requirements, the Court must analyze each one individually. *Frazier*, 387 F.3d at 1260.

**Qualifications**: An expert may be qualified by knowledge, skill, experience, training, or education. *Easterwood v. Carnival Corp.*, No. 19-CV-22932, 2020 WL 6880369, at *2 (S.D. Fla. Nov. 23, 2020). An expert is not necessarily unqualified simply because his experience does not precisely match the matter at hand. *Id*. So long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight of the expert's testimony, not its admissibility. *Id*.

**Reliability**: In determining the reliability of an expert's methodology, the Court considers: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. *Frazier*, 387 F.3d at 1262. This same criteria applies to both scientific opinions and experience-based testimony. *Frazier*, 387 F.3d at 1261-62. (citing *Kumho Tire Co.*

*v. Carmichael*, 526 U.S. 137, 152 (1999)). Even so, the Court is allowed significant flexibility to consider other factors relevant to reliability. *Kumho Tire Co.*, 526 U.S. at 152.

**Helpfulness**: Expert testimony is only admissible if it concerns matters that are beyond the understanding of the average lay person and offers something more than what lawyers can argue in closing arguments. *Webb v. Carnival Corp.*, 321 F.R.D. 420, 425 (S.D. Fla. 2017) (quoting *Frazier*, 387 F.3d at 1262–63). While an expert may testify as to his opinions on an ultimate issue of fact, "he may not testify as to his opinions regarding ultimate legal conclusions." *Umana–Fowler v. NCL (Bahamas) Ltd.*, c, 1122 (S.D. Fla. 2014) (quoting *United States v. Delatorre*, 308 Fed.Appx. 380, 383 (11th Cir. 2009). "[M]erely telling the jury what result to reach is unhelpful and inappropriate." *Umana–Fowler*, 49 F.Supp.3d at 1122 (citing *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990).

### B. Proving A Maritime Negligence Claim

"A negligence claim requires proof that '(1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm.'" *Sorrels v. NCL (Bahamas) Ltd.*, No. 13-cv-21413, 2013 U.S. Dist. LEXIS 170890, 2013 WL 6271522, at *2 (S.D. Fla. Dec. 4, 2013) (*quoting Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012)). Under maritime law, "a shipowner owes to all persons properly aboard the ship 'the duty of exercising reasonable care under the circumstances of each case.'" *Id*. (*quoting Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 628 (1959)). "When a passenger claims that [he or] she was injured by a dangerous condition on the ship, this standard of care normally 'requires, as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition.'" *Id*. (*quoting Keefe v.*

*Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989)). In cases where the plaintiff alleges that the defendant itself created the dangerous condition, he or she "must prove that [that the defendant] 'created the allegedly dangerous condition sufficient to constitute a breach of its duty of reasonable care.'" *Id*. (*quoting Long v. Celebrity Cruises, Inc.*, 982 F. Supp. 2d 1313, 1317 (S.D. Fla. 2013)).

IV. **DISCUSSION**

With the foregoing in mind, the undersigned turns to the admissibility of Mr. Jaques's opinions offered in this case.

Mr. Jaques's Report is replete with opinions, *e.g.*:

- Ms. Carol Kelly did not sustain this impaled screw injury prior to boarding the vessel;
- The screw came from the interior of the stateroom;
- The screw that became embedded in Ms. Kelly's foot, more likely than not, came from an air vent, bathroom fixture, balcony/balcony door fixture(s), door dampener, cabinet hinge or other one of the many items in the cabin requiring screws of the same size and type within Ms.Kelly's stateroom;
- Carnival is at fault for not ensuring the stateroom fixtures (such as an air vent or door hinge) were functional, in good maintenance, and not missing screws;
- Failure to maintain the mechanical components, including, screws in the Plaintiff's stateroom was a careless and negligent act on the part of Housekeeping and the Hotel engineer aboard the vessel;
- Carnival is at fault for not completing a proper stateroom inspection prior to the Kelly family occupying the stateroom;
- These failures were the cause of a loose screw falling into the carpet of Ms. Kelly's stateroom and a direct cause of Ms. Kelly's injuries;
- The loose screw would not have been on Ms. Kelly's stateroom floor had Carnival's crew complied with its own policies and procedures;
- Carnival was negligent for allowing for the inspection of cabin compliance to break down.

ECF No. 22-2 at 10-15. For purposes of Defendant's Motion, the Report can be broken down into three opinions, summarized as follows: (1) the screw that injured Ms. Kelly came

from her stateroom and Carnival is at fault for not ensuring the room's fixtures were in good condition, (2) failure to maintain the mechanical components in Ms. Kelly stateroom was a careless and negligent act by Carnival's staff, and (3) Carnival was negligent for allowing the inspection of cabin compliance to break down. [ECF No. 22-2 at 10-15].

Carnival seeks to exclude Mr. Jaques's opinions on the grounds he is not qualified to render them, the opinions are unsupported by a reliable methodology, and they are unhelpful to the trier of fact. [ECF No. 22 at 5].

### A. Qualification

The first inquiry when determining the admissibility of expert testimony is whether the expert is qualified to testify competently regarding the matters he or she intends to address at trial. *City of Tuscaloosa*, 158 F.3d at 563. "Determining whether a witness is qualified to testify as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony.'" *Ciena Inv., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 660 (S.D. Fla.2012) (quoting *Jack v. Glaxo Wellcome, Inc.*, 239 F.Supp.2d 1308, 1314–16 (N.D. Ga.2002)).

In his expert report, Mr. Jaques lists his qualifications at length as follows:

> …As a cruise line safety officer and chief of security aboard multiple cruise ships, and lately as a private marine and cruise ship security and safety consultant I have been investigating and testifying in maritime accidents and wrongful death all over the world.
> I served as a police officer & Homicide Detective with the City of Reno & Coral Gables Police, Washoe County School Police Departments. During that employment I functioned in part as a marine patrol officer and was required to obtain various training and certifications from the U.S. Coast Guard. I am a qualified seamen and small boat captain since 1984.
> In 1990, I was activated by the Army Reserves to serve in the Gulf War (Office of the Inspector General). Following my return from the Gulf War, I became employed by CARNIVAL CORPORATION as a Chief Security Officer, and served as such on a number of vessels until approximately December, 2007 with three different cruise lines. In 2006 I obtained my certificate as Safety Officer

with Holland American Line. I was responsible for identifying hazards on board cruise ships and I was responsible for investigating accidents and incidents occurring aboard cruise ships and identifying the causes of such accidents and incidents, conducting root cause analysis, and making recommendations for corrective actions.

I was responsible for supervising tender operations in ports. "Tenders" are small commercial motor vessels which are used to transport passengers between ship and shore in ports which have no docks for cruise ships. Such small passenger vessel operations are inherently dangerous and require the establishment, exercise and strict enforcement of standard safety precautions to avoid mishaps and injury. Such small commercial passenger vessels require a crew trained and skilled in passenger management and safety. I was also a trained-On Scene Commander for emergency situations such as fire and evacuation, and a lifeboat commander.

In 2001, I was hired by Norwegian Cruise Line to work full-time as a security chief aboard various NCL vessels, where I was responsible for identifying hazards on board those cruise ships and was also responsible for investigating accidents and incidents and identifying the causes of such accidents and incidents, conducting root cause analysis, and making recommendations for corrective actions. I continued in this role with Norwegian Cruise Line until 2003, when I deployed to Afghanistan in connection with my reserve duties. After this tour, I served briefly as a security officer aboard a Disney Cruise Line vessel in the latter part of 2004, also charged with identifying shipboard hazards and investigating accidents and incidents and identifying causes and making recommendations for corrective action. Following that, I went on to work for Holland American Line.

Between March 2005 and July 2006, I worked as a security manager and safety officer, aboard vessels of Holland America Line (a subsidiary of CARNIVAL). The scope of my duties as a security manager and safety officer with Holland America Line were similar to when I was employed by Carnival, NCL, Disney, and previously with Holland America. As security officer I inspected the ships to identify hazards aboard those ships and investigated every accident or injury producing incident that occurred on the vessel, on the pier, and during shore excursions to ultimately determine the cause(s) of each accident or incident and to make recommendations for corrective actions. These accidents and incidents numbered approximately 15 to 25 per voyage. My estimated total accidents and injuries investigated surpass 2,000 cases, both at sea and on land. Accidents ranged from slip and falls, trip and falls, stairwells, falls from heights, head injuries, limb amputations, death at sea, man over board, criminal assaults, sexual assaults, tenders, gangways, ramps, engine room falls, burns, fires, food allergies, bike accidents, bus accidents, drowning, slide injuries, & scooter accidents, propeller accidents, and emergency medical evacuations at sea. During the emergency medical evacuations, it was my job as on scene commander to work directly with the Staff Captain, Doctor, nurses, safety officer and Master of the vessel to establish a logistical plan for the evacuation. Typically, I would meet with the staff captain and Doctor to determine how the debarkation will happen and where it will take place. I investigated hundreds of passenger and crew

accidents at sea and in port. A number of these accidents involved Death At Sea Or On Shore Excursions.

In 2008 I registered Randall W. Jaques LLC in the State of Florida, I have owned and operated my own marine/maritime security and safety consultancy since then. I have performed hundreds of investigations and evaluations of marine casualties, most often involving cruise ships. In my own marine/maritime security and safety consultancy, I conduct these investigations and evaluations of marine casualties utilizing the same methodology, described herein, as when I was employed by the cruise lines as a safety officer and security officer. I have been asked to perform such services for the cruise industry and for representatives of persons injured during cruises for both the Defense and Plaintiff firms. As the ombudsman for the United States Coast Guard, Sector Miami 2006-2018. I also had 4 CG Cutters that I represent for the command. I am extremely well versed in the emergency operations, and capabilities of the USCG during a air/sea emergency situation or Code Oscar MOB Man Overboard. As a professional maritime consultant, I have conducted hundreds of site and vessel inspections worldwide which include the scenes of accidents and incident and also have included the inspection of medical facilities where emergency treatment was conducted. My site, vessel, and medical facility inspections were conducted to perform accident reconstructions, identify hazards, determine accident or incident causes, review policies and procedures in light of SOLAS, and evaluate the safety, security, premises safety, and evaluation of professional services offered. In order to evaluate medical facility inspections aboard vessels, I would interview the facility administrator and ask questions pertaining to what care or trauma treatment can be offered.

Recently I have upgraded my STCW certification in Crowd Management and continue my education with the Maritime Professional Training Center in Ft. Lauderdale, Florida. In May of 2015, Chief Judge Kevin Michael Moore approved and acknowledged that Randall W. Jaques is to be recognized as a maritime safety expert and crowd and crisis control management expert in the Southern District Court of Florida.

ECF No. 22-2 at 2-4].

Defendant argues that Mr. Jaques is not qualified to render the opinions in his Report because he has not shown how his work experience would qualify him to render any of the offered opinions. [ECF No. 22 at 5].

The qualification inquiry "is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Ciena Invs.,* 280 F.R.D. at 661 (citing *Vision I Homeowners Ass'n, Inc. v. Aspen*

*Specialty Ins. Co.*, 674 F.Supp.2d 1321, 1325 (S.D.Fla.2009). Here, Mr. Jaques has shown that he does have substantial experience in the cruise ship industry and in conducting inspections and investigations of injuries occurring on cruise ships. The undersigned will assume, without deciding, that Mr. Jaques's background and experience qualify him as a Cruise Ship Safety Expert in this case.

### B. Reliability

Defendant next argues that Mr. Jaques's opinions must be excluded because they are not reliable on the grounds Mr. Jaques fails to demonstrate that he used a reliable methodology in reaching his conclusions. [ECF No. 22 at 6]. More specifically, Defendant argues Mr. Jaques's opinions "lack[] a scientific basis and [are] not rooted in scientific analysis" and instead are "the product of Mr. Jaques's own sheer speculation." [ECF No.22 at 7 (citing *Quevedo v. Iberia, Lineas aereas De Espana, S.A. Operadora Unipersonal*, No. 17-21168-CI, 2018 WL 4932097, at *3 (S.D. Fla. Oct. 11, 2018))]. Defendant also argues that to the extent Mr. Jaques relies on his own experience in support of his opinions, he has not shown how his work experience applies to the analyses or conclusions he reaches here. *Id*. at 6-9.

Plaintiff responds that Mr. Jaques's conclusions are based upon a scientific method and that Defendant can replicate the methodology. [ECF No.31 at pp. 3, 6]. She further argues, "The complex process of investigating a scene of an incident is not something a lay person commonly does. As such, Jaques extensive scientific analysis and ultimate opinion regarding the time when Ms. Kelly stepped on the screw is important to assist the jury in understanding the complexities of accident/incident investigation." *Id*. at 4. Finally, Plaintiff asserts that Mr. Jaques was not deposed and that had Defendant deposed him, "[t]hey would know that his methodology is sound and capable of being replicated." *Id*.

Reliability is different than believability or persuasiveness, which remains an issue for the trier of fact. *Rink*, 400 F.3d at 1293 n. 7. To evaluate the reliability of an expert opinion, courts consider, to the extent practicable: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique and (4) whether the technique is generally accepted in the scientific community. These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion. *Frazier*, 387 F.3d at 1261-62.

Mr. Jaques explained the methodology used in his report in a paragraph titled "**OVERALL METHODOLOGY**." [ECF No. 22-2 at 6]. In this section, Mr. Jaques explains:

> My analysis started with a comprehensive review of applicable codes, standards, and laws available at the time of the subject incident. Further, I reviewed all available documents and evidence provided to me (Carnival Cruise Line's business records, inspection of the subject screw, photographs of the subject stateroom, case pleadings, generic Youtube video of a similar balcony cabin, and discovery including Defendant's responses to Interrogatories and Requests for Production) and I conducted detailed interviews of the Plaintiff and her son, Robert Kelly. Robert Kelly was onboard the subject cruise and had personal knowledge of the facts relevant to my analysis. With all of the evidence I reviewed, I performed an accident reconstruction and analysis from a cruise ship safety expert perspective utilizing a comprehensive methodology of analysis, as I have done thousands of times in the past in my former roles as Safety Officer and Security Officer aboard cruise ships and thereafter as a cruise ship safety and security consultant.

ECF No. 22-2 at pp. 6-7. He also includes a list of "References" identifying ten things, presumably publications he reviewed, but most are not fully cited, nor are they attached to the Report, and he does not indicate how he used the referenced items to support his opinions. *See id*. at pp. 5-6.

Other than the vague reference to the ten listed "References," Mr. Jaques does not articulate any code, standard, or law in his report. The only authority mentioned is an uncited reference to a "Cruise Industry sustainability report" in support of his statement that cruise ship operators have an obligation to identify and correct hazards before an injury occurs, *id*. at 7, and a link to *marineengineeringonline.com* to bolster his statement that "screws are known to fail at sea due to the vibrations on the ship and the salt water corrosion." *Id*. at 13-14. Meanwhile, as noted above, Mr. Jaques did not inspect the ship nor Plaintiff's actual stateroom or perform any testing on its flooring. He did not consult any books, articles, studies, or reports specific to the design or structure of the ship or the room, nor did he indicate having done any such independent research in order to form his opinions. *See id*. at 6-7. Rather, Mr. Jaques's opinions in this case appear to be premised almost entirely upon his experience and his observations or inferences derived from watching a *YouTube* video of what he believes to be a similar stateroom, Plaintiff's photographs of her stateroom, and his interviews with the Plaintiff and her son, *see, id.* at 6, with no clear explanation of any connection between his experiences and his ultimate opinions. *See Farley v. Oceania Cruises, Inc.*, 2015 WL 1131015, at *8 (S.D. Fla. Mar. 12, 2015) (holding that Mr. Jacques's methodology failed because he did not inspect the vessel where the accident took place, interview any crew member, or provide a detailed explanation of how his experience supports his opinions or what materials he consulted to reach his conclusions) (citing *Umana-Fowler*, 2014 WL 4832297, at *2).

In addition, as Defendant points out and several other courts in this District have observed, Mr. Jaques is "no stranger to *Daubert* challenges to his flawed methodology and unhelpful opinions." *Easterwood*, 2020 WL 6880369 at *9. Based on a review of Mr. Jaques's

Report and the parties' memoranda and supporting materials in this case, this Court agrees with Defendant and with the several other district courts to have found that Mr. Jaques's opinions suffer from serious and fatal methodological flaws. As Magistrate Judge Torres explained in *Webb*:

> Mr. Jaques' methodology suffers from many of the same deficiencies identified in *Farley*. His expert report simply lists a number of conclusory statements without any foundation. He does not demonstrate whether he performed any analysis nor does he indicate whether his opinions were subject to any verification or peer review, or how his experience specifically informed his opinions. Neither his report nor his testimony references a single study, article, or authority to support his opinions. *See* [*Johnson*, 2007 U.S. Dist. LEXIS 103454, 2007 WL 9624459, at *7] (finding that "Plaintiff's assertions fall far short of demonstrating *how* Jaques' experience leads to his conclusions and opinions, *why* his experience is a sufficient basis for his opinions, and *how* his experience is reliably applied to the facts of Plaintiff's case.") (citations omitted).
>
> The advisory committee notes for Rule 702 further illustrate how Mr. Jaques' reliance on his experience, and the various items mentioned in Plaintiff's response, fail to satisfy the reliability prong of *Daubert*:
>
>> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'
>
> *Sorrels v. NCL (Bahamas) Ltd.*, 2013 U.S. Dist. LEXIS 170890, 2013 WL 6271522, at *6 (S.D. Fla. Dec. 4, 2013) (quoting Fed. R. Evid. 702 advisory committee notes (2000 amends.) (emphasis added)). Most of Mr. Jaques' opinions and testimony are not "tethered to any supporting materials or sources" as there are no studies, peer-reviewed materials, treatises, sources, data nor anything else underlying his views. *Farley*, 2015 U.S. Dist. LEXIS 30576, 2015 WL 1131015, at *7. Instead, his opinions are conclusory statements regarding Defendant's fault that [are] not tied to any methodology. Moreover, Mr. Jaques does not explain why the items he relied upon—in addition to his experience— provide a sufficient basis for his opinion, especially in light of the fact that they merely lead to legal conclusions.

*Webb*, 321 F.R.D. at 429-30 (citing *Farley*, 2015 WL 1131015, at *1).

In the instant case, Mr. Jaques's stated methodology presents the same issues described by Judge Torres in *Webb* and by the other courts cited therein. Accordingly, consistent with

the reasoning in *Webb* and numerous other cases in this District, this Court also concludes that Mr. Jaques's opinions do not satisfy the reliability requirement of *Daubert* because they lack any proper methodological foundation.

### C. Helpfulness

Defendant next argues that even if Mr. Jaques satisfied the reliability prong, his opinions must nevertheless be stricken because "they are not beyond the understanding of an average layperson and do nothing to help the jury." [ECF No. 22 at pp. 9, 13, 18].

"[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person" and offers something "more than what lawyers for the parties can argue in closing arguments." *Webb*, 321 F.R.D. at 425 (quoting *Frazier*, 387 F.3d at 1262-63). Furthermore, while "[a]n expert may testify as to his opinions on an ultimate issue of fact . . . he 'may not testify as to his opinion regarding ultimate legal conclusions.'" *Umana-Fowler*, 49 F. Supp. 3d at 1122 (quoting *United States v. Delatorre*, 308 Fed. Appx. 380, 383 (11th Cir. 2009)). "[M]erely telling the jury what result to reach is unhelpful and inappropriate." *Id.* (citing *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)).

Initially, the undersigned notes that many of Mr. Jaques's opinions assigning fault to Carnival, indicating that it was on notice of any dangerous condition, and imputing negligence to the cruise line and its staff opine on ultimate legal conclusions at issue in this case and, therefore, impermissibly invade the province of the jury. As such, his opinions assigning fault must be stricken. *See Maxwell*, No. 19-CV-23054, 2021 WL 1049513, at *5 (holding that Mr. Jaques' opinions assigning fault to Defendants and indicating that

Defendants had notice of a dangerous condition must be stricken); *Farley*, 2015 WL 1131015, at *9 (same).

The undersigned agrees with Defendant that what remains of Mr. Jacques's opinions after striking all impermissible legal conclusions is not beyond the understanding of a lay person and, therefore, must also be excluded. Mr. Jaques's remaining opinions boil down to his conclusion that the screw Plaintiff stepped on must have been on the floor of her stateroom. This opinion derives from his interviews of Plaintiff and her son and his review of a maintenance log for the stateroom that showed various repairs made in the weeks prior to the incident. [ECF No. 22-2 at 10]. "[T]he evidence upon which [Mr.] Jaques relied in forming his opinions and conclusions is well within the understanding of the average layperson." *Easterwood*, 2020 WL 6880369, at *10 (quoting *Johnson v. Carnival Corp.*, No. 07-20147-CIV, 2007 WL 9624459, at *7 (S.D. Fla. Dec. 19, 2007)).

Having determined that Mr. Jaques's methodologies are not reliable and that his opinions and testimony are inadmissible and will not assist the trier of fact, this Court finds that Mr. Jaques must be stricken as an expert for the reasons stated above.

## V.  CONCLUSION

Based on the foregoing, it is hereby

**ORDERED and ADJUDGED** that Defendant's *Daubert* Motion in Limine to Strike Report and Opinions of Randall Jaques [ECF No. 22] is **GRANTED**.

**DONE AND ORDERED** in Chambers at Miami, Florida this 23rd day of March, 2022.

_____
MELISSA DAMIAN
UNITED STATES MAGISTRATE JUDGE